# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LINNOSKA CORREA CARRILLO, in representation of her minor daughter JPC<br><br>Plaintiff<br><br>vs.<br><br>GRUPO HIMA SAN PABLO (FAJARDO), INC. or alternatively, JOHN DOE CORPORATION d/b/a HOSPITAL HIMA SAN PABLO (FAJARDO); DR. LUIS E. PARDO TORO and his wife JANE DOE, each of them personally and in representation of their conjugal partnership; JOHN DOES 1, 2 and 3; CORPORATIONS A, B and C; UNKNOWN INSURANCE COMPANIES A through H<br><br>Defendants | CIVIL NO.: 17-<br><br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

## COMPLAINT

**TO THE HONORABLE COURT:**

COMES NOW minor plaintiff JPC, a minor whose interests are represented in this proceeding by his mother, Linnoska Correa Carrillo, through his undersigned counsel, and very respectfully states and prays as follows:

### Jurisdiction, Venue and Parties

1. The events or omissions giving rise to the claims set forth in this action all occurred within the District of Puerto Rico and the Commonwealth of Puerto Rico.

2. Federal jurisdiction in this case is attained under diversity pursuant to section 1332 of Title 28, United States Code. Venue is appropriate in this judicial district pursuant to section 1391(b) of Title 28, United States Code.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

4. Linnoska Correa Carrillo ("Mrs. Correa"), is a citizen and resident of the State

of Michigan, and appears herein in the best interest and as parent and legal representative of her minor daughter, plaintiff JPC, also a Michigan citizen and resident.

5.  Defendant Grupo HIMA San Pablo-Fajardo, Inc. or alternatively, John Doe Corporation d/b/a Hospital HIMA San Pablo (Fajardo), (hereinafter " HIMA") is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico which has its principal place of business in Puerto Rico. HIMA is the owner and/or operator of a hospital of the same name, located in Fajardo, Puerto Rico.

6.  Defendant Doctor Luis E. Pardo Toro ("Dr. Pardo") is a medical doctor, specializing in obstetrics and gynecology, married to codefendant Jane Doe and together with her constituting a conjugal partnership, who provided medical treatment to Mrs. Correa and her minor daughter JPC. Dr. Pardo and his wife are domiciled in Puerto Rico, where they reside. At all times relevant to this claim Dr. Pardo was employed at and/or was a staff physician of HIMA.

7.  All of the other defendants are citizens and residents of the Commonwealth of Puerto Rico or states and territories other than the state of Michigan. John Does 1, 2 and 3 and Corporations A, B and C are persons and/or corporations, whose identities are presently unknown, which by their negligent acts or omissions caused or contributed to the damages claimed herein.

8.  Unknown Insurance Companies A through H, insurers whose identities are presently unknown, insured the aforementioned defendants and are jointly responsible with their respective insureds for the damages claimed herein pursuant to section 2003 of Title 26 of the Annotated Laws of Puerto Rico.

## Factual Allegations

9. On February 22, 2013, Linnoska Correa, a 16 year old student who did not use tobacco or alcohol or street drugs, made her first appearance during this, her first pregnancy at Concilio de Salud Integral de Loíza, Inc.

10. Her HCG was positive on February 17, 2013.

11. Linnoska had no previous operations but had a history of urinary tract infection.

12. At her first official prenatal visit on March 7, 2013 she had a blood pressure of 100/60 and her genital culture showed she was chlamydia-positive, treated by a macrolide antibiotic, and her ultimate test of cure was negative.

13. She was O positive, antibody screen negative, serology negative, urinalysis showing no protein or infection, sickle cell negative, Pap Class I with candida, HIV negative, hepatitis negative, urine culture negative and TSH normal.

14. An ultrasound on March 8, 2013 showed a crown-rump length measurement consistent with 11 weeks 0 days, yielding a due date of September 27, 2013.

15. Serial blood pressure determinations were consistently 100/60.

16. On May 30, 2013 she was seen at Hospital UPR Dr. Federico Trilla, ultimately discharged on May 31, 2013, for unspecified abdominal pain. Abdominal/Obstetrical sonogram and surgery consultation to rule out appendicitis could not demonstrate an inflamed appendix, her physical exam revealed that no surgical management was necessary, her blood pressure had a maximum of 119/72, she had no fever and her laboratory values were as follows: normal liver function tests, WBC 9.9 with H/H 10.3/32.3 and platelets 326, normal urinalysis, BUN 5 and creatinine 0.37.

3

17.	On July 11, 2013 Linnoska Correa requested a copy of her prenatal record, since she was moving to Fajardo, the place of her birth. Up to this point this was a normally progressing pregnancy with no problems identified that specifically endangered the well-being of mother and baby.

18.	The records from the office of Dr. Luis E. Pardo Toro (Fajardo, PR) show two office visits, a postpartum visit on August 20, 2013 and a prenatal visit on July 29, 2013. The patient's blood pressure on the prenatal visit was 136/86, appreciably higher than the other blood pressures during the pregnancy. The standard of care required additional blood pressure determinations during the office visit to note any upward or downward trend, as well as proper physical examination and urinary protein determination and inquiring about maternal perception of fetal movements, none of which were done. It is evident that Dr. Pardo did not appreciate the high risk nature of a teenage primigravida pregnancy, especially with regard to the increased risk of development of a hypertensive disorder of pregnancy such as preeclampsia.

19.	Linnoska was admitted to Hospital HIMA-San Pablo, Fajardo, under the care of Dr. Pardo, on July 30, 2013 at 31 plus weeks gestation, well past viability but remote from term.

20.	Diagnosed with severe preeclampsia, she ultimately delivered on August 1, 2013 by a negligently delayed cesarean section and was discharged on August 4, 2013. Contractions on admissions were described as every 2-3 minutes lasting 30 seconds to one minute, the pelvic exam was described as 70/ fingertip (1 cm), and the blood pressures were recorded as 152/112 and 150/110 and 152/103. Membranes were intact and the patient was normoreflexic. The fundal height of 32 cm served to dispel any

consideration of chronic intrauterine growth restriction, the presentation was vertex, and laboratory values were as follows: WBC 13.6 with H/H 9.5/29.5 and platelets 229, urinalysis showed trace blood with 3 plus protein and few bacteria/white cells and negative nitrite/leukocytes, the urine culture was eventually reported as negative, BUN 8 with creatinine 0.60 and uric acid 5.3, ALT 12, AST 25, bilirubin 0.4, LDH 287 (140-271), normal clotting studies and negative Coombs test. Ultrasound showed a singleton vertex with placenta anterior grade III, a fetal heart rate of 164, AFI 14cm, sonographic estimated gestational age 32 weeks, normal anatomy, a three vessel cord and sonographic estimated fetal weight 4 pounds 2 ounces.

21.   The admission note at 8:00 pm describes a headache and epigastric pain. Dr. Pardo describes the prognosis as "guarded". The standard of care required initially magnesium sulfate anticonvulsant prophylaxis (which also has tocolytic and neuroprotective properties) - indeed the July 31, 2013 12:35 pm Magnesium level was 5.8 (1.4-2.3) and stabilization of the mother by bringing her blood pressure down to acceptable levels. This was accomplished by utilizing Normodyne (Labetalol) and Hydralazine (apresoline). Ampicillin was started as antibiotic prophylaxis. At this point an attempt at accelerating fetal pulmonary maturation with steroids is acceptable if any improvement in the initial fetal heart tracings is noted and is consistent and persistent, with the clinical situation completely devoid of any deterioration in fetal heart tracings or evidence of such threats as evidence of placental abruption (predisposed to by maternal hypertension). It is to be remembered that the (initiation of the) cure for severe preeclampsia is delivery of the baby and placenta. With this gestational age and estimated fetal weight, the risk of prematurity-related fetal death or cerebral palsy is

acceptably low compared to the risk of maintaining this pregnancy in a hostile intrauterine environment beyond what the standard of care requires in this clinical situation.

22. Dr. Pardo started Decadron but deviated from the standard of care by waiting for its peak effect despite evidence of a worsening intrauterine environment. The obstetrical nurses were aware, or should have been aware, of the need to cease any attempt at conservative management based on the fetal heart tracings information. Their duty was to engage Dr. Pardo in a respectful private conversation to convince him to amend his management plan and perform immediately a cesarean section. If they were unsuccessful in this regard their duty was to activate their chain of command, acting as advocates for the endangered mother and baby. Failure of these obstetrical health care providers (doctor and nurses) to follow this standard of care resulted in the child remaining in a hostile intrauterine environment well beyond what was acceptable, and substantially predisposed to and contributed to the child's grave and permanent injuries.

23. Despite adequate magnesium sulfate anticonvulsant prophylaxis and an acceptable blood pressure response to pharmacological intervention, the desperately needed cesarean section (as required by the fetal heart monitor data) was not performed until the morning of August 1, 2013. Both Dr. Pardo and the hospital obstetrical nurses, as described, were responsible for this negligent delay. Dr. Pardo himself described the prognosis as "guarded" indicating that he realized that there was significant risk, thus triggering the requirement for heightened surveillance and rapid movement to cesarean section as indicated by the available data.

24. At 8:00 am on July 31, 2013 Dr. Pardo ordered the patient to have a regular low salt diet and that she may ambulate, completely inconsistent with the ongoing threat

to fetal wellbeing. With an emergency cesarean section possible at any moment due to clinical circumstances (fetal heart monitor data and what was certainly an early grade placental abruption and the fact that attenuation of the external manifestations of severe preeclampsia does not change the ongoing disease process itself), the doctor and the nurses who did not intervene as described once again deviated from the standard of care.

25. Patients, especially pregnant patients, should not to be fed on the brink of surgery so as to reduce the risk of aspiration and the ambulating high risk patient is removed from the critical data gathering processes. Finally, with Linnoska still at risk for eclamptic seizure without magnesium sulfate prophylaxis, Dr. Pardo at 9:00 pm on July 31, 2013 ordered that the magnesium sulfate be discontinued, a deviation from the standard of care since the anticonvulsant properties and tocolytic properties and neuroprotective properties of this drug would be reduced, then lost. The nurses, as described, did not intervene on behalf of the patient and therefore again deviated from the standard of care.

26. JPC was born by cesarean section performed by Dr. Pardo at 8:56 am on August 1, 2013, with Dr. Rosario caring for the baby. Under spinal anesthesia, the operation resulted in the birth of the child with Apgars 7-8 and without congenital anomalies. The baby was intubated and transported to the NICU. Dr. Pardo described a 20 percent placental abruption (certainly foreseeable because of the clinical circumstances and fetal monitor data) with what he described as a 50 ml placental clot and a 600 ml estimated blood loss (certainly underestimated since the average blood loss at cesarean section is around 1000 ml and there was additional blood loss from the abruption). He also described a Couvelaire uterus with bluish discoloration (blood

insinuating itself among the myometrial fibers), adding to the blood loss. Indeed the hemoglobin the afternoon of the surgery was 7.1, falling to 6.6 the morning of August 3, 2013 with the patient feeling dizzy and requiring a blood transfusion. The pathology report showed retroplacental hematomas comprising fifty percent of the maternal surface and unremarkable fetal membranes. The placental weight was 466 grams and there was a three vessel cord. The report goes on to describe the maternal surface showing adhered blood clots compressing the maternal surface and occupying approximately fifty percent of the parenchyma. Performance of an emergency cesarean section when indicated would have prevented the perpetuation of this additional threat to fetal oxygenation. The nursing notes form the operating area display their substandard appreciation of the gravity of the situation, as evidenced by their checking elective as opposed to emergency ("evaluación pre-quirurgica") and again checking elective as opposed to emergency ("tipo de cirugía").

27.     Poignant aspects of the patient evaluation in the early evening of July 30, 2013 include abdominopelvic constant pain 8/10, with nursing notes describing pain intensity as 5/10 with intermittent frequency. An admission pain estimate describes moderate contractions 8-9/10. Review of the initial fetal monitor tracings reveals multiple contractions. In this clinical circumstance, even before the initiation of Magnesium Sulfate, the reasons for this contractility include: Idiopathic, cocaine use (the patient is documented to not use illegal drugs), infection (there was no evidence of urinary tract infection nor was there any evidence at any time of clinical chorioamnionitis. Indeed, the pathology report describes unremarkable fetal membranes) and placental abruption (with the elevated blood pressure on admission, this was certainly a strong consideration, in

the form of "concealed hemorrhage").

28. JPC was officially admitted at 9:23 am and was described as AGA for 31 weeks, and was found to have respiratory failure, low birth weight and respiratory distress syndrome. In case of sepsis the child was started on Ampicillin and Gentamicin and was given Survanta and IPPV. The birth weight was documented as 1622 grams. There was no respiratory effort after birth and the child was intubated in the operating room and given manual ventilation 100 percent oxygen. After stabilization, with a heart rate of 160 the baby was transferred to the NICU and had an initial NICU pH of 7.3. Surfactant therapy was given with a poor response, with a post surfactant pH of 7.27. The assessment was cardio-respiratory unstable with no respiratory effort and need to transfer to a supraterciary facility.

29. Additional August 1, 2013 data included a head ultrasound without evidence of germinal matrix hemorrhage or intraventricular hemorrhage, a renal ultrasound reported as normal study, and a babygram suggestive of respiratory distress syndrome and displaying multiple air-filled dilated bowel loops. In the late afternoon/early evening that day JPC was transferred to NICU, Centro Médico Fajardo, carrying a diagnosis of respiratory failure with hypoxia and with a "guarded" prognosis.

30. Review of the fetal heart monitor tracings starting at 20:05 on July 30, 2013 reveals a fetal heart baseline of a tachycardiac 170 with multiple contractions and recurrent late decelerations. The variability was predominantly minimal to absent throughout the entire tracing (not entirely unexpected with magnesium sulfate) and the standard of care required a cesarean section if the initial pharmacological interventions did not reduce the contractility rate and non reassuring pattern with maternal stabilization.

There was sufficient improvement from the initial tracings to permit the utilization of decadron with the understanding that any indication of the intrauterine environment becoming more hostile or evidence of placental abruption such as "concealed hemorrhage" required an emergency cesarean section to protect the fetal central nervous system. It has already been described that the initial uterine contractility was consistent with but not entirely diagnostic of placental abruption in the form of "concealed hemorrhage".

31. In this case with magnesium sulfate on board there should be essentially no uterine contractility in this clinical circumstance. Since uterine contractility persisted with magnesium sulfate and one could rule out cocaine use and infection, in this clinical circumstance there is nothing in nature to explain the persistent contractility other than placental abruption in the form of "concealed hemorrhage". Failure of Dr. Pardo to perform an emergency cesarean section in this circumstance, and failure of the obstetrical nurses to advocate for the patient as described above, utilizing their chain of command if needed, are serious deviations from the standard of care and substantially predisposed to and substantially contributed to the unfortunate baby's outcome.

32. There were no monitor tracings available from 08:26 to 09:21 on July 31, 2013, perhaps because the patient was ambulating, a nurse-doctor deviation as described above.

33. Intermittent short runs of moderate variability were occasionally noted, as were variable decelerations associated with a "shoulder". If the cesarean section had not been performed by 14:32 on July 31, 2013, it was certainly absolutely emergently required in this clinical circumstance because at that time the tracing displayed 6 plus minutes of a

sinusoidal-type pattern (fluctuations were regular in amplitude and frequency) followed by an ominous deceleration to below 100. The presence of occasional accelerations beginning at 15:50 on July 31, 2013 is consistent with the concept that the child would not have had the extent of permanent CNS injury or may have escaped permanent CNS injury completely had the doctor and nurses not deviated from the standard of care.

34.     Due to the negligence of the defendants, the plaintiff JPC suffered severe injuries and neurological permanent damages that have multiple adverse effects on his physical and mental functioning.

35.     As a result of the injuries she sustained, JPC is a permanently injured child who will not have a normal life and will require continuing care for his condition. Moreover, as a result of his permanent disability JPC's potential to generate future income has been adversely affected.

36. Careful analysis of the facts and events of this case reveals that Hospital HIMA San Pablo Fajardo and Dr. Pardo, were practicing below the standard of care in the treatment provided to Mrs. Linnoska Correa Carrillo and her daughter JPC. Defendants' departures from the medical standards of care and/or professional negligence include, but are not limited to: failure by Dr. Pardo and Hospital HIMA San Pablo, Fajardo, acting in its institutional capacity through its agents the obstetrical nurses, to remove this child from a hostile intrauterine environment well beyond what the standard of care required as a delivery time; failure to initiate magnesium sulfate anticonvulsant prophylaxis (which also has tocolytic and neuroprotective properties) and stabilization of the mother by bringing her blood pressure down to acceptable levels; failure to a rapid movement to cesarean section as indicated by the available medical data; failure to identify a hostile

intrauterine environment well beyond what was acceptable which substantially predisposed and contributed to the child's grave and permanent injuries; failure to identify moderate variability as variable decelerations. The presence of occasional accelerations is consistent with the concept that the child would not have had the extent of permanent CNS injury or may have escaped permanent CNS injury completely had the doctor and nurses not deviated from the standard of care.

37. Key concepts in this clinical situation that were known, or should have been known, by Dr. Pardo and the nursing staff included: a) severe preeclampsia poses a threat to the health, life and wellbeing of both mother and baby. Included is the threat of suboptimal oxygenation to the baby's brain, especially consequential since the premature fetal brain is more sensitive to suboptimal oxygenation compared to the term fetal brain; b) Pharmacological intervention only ameliorates the outward manifestations of the disease process but does not abate the disease process itself. The (initiation of the) cure is delivery of the baby and placenta; c) With the known serious sequelae of severe preeclampsia there exists the requirement for heightened surveillance and the need for rapid movement to cesarean section if there is any continuation or development of any indication that the baby is not thriving inside the uterus, including evidence consistent with placental abruption; d) The vasopastic component of severe preeclampsia, manifested by maternal hypertension, predisposes to and is a known risk factor for placental abruption; e) It is necessary to stabilize the mother by improving her blood pressure pharmacologically to an acceptable level and to utilize magnesium sulfate to prevent an eclamptic seizure, prior to movement toward delivery. As the mother is then stabilized and protected against seizure, an attempt to accelerate fetal pulmonary maturity through

the uses of glucocorticoid steroids is acceptable if there is a noted improvement, which is sustained, in fetal circumstance. Any indication of fetal exposure to deteriorating oxygenation, such as nonreassuring fetal monitor tracings at any moment or evidence of placental abruption, requires immediate cessation of any conservative management attempt and rapid movement to abdominal operative delivery.

38. The permanent brain damage of JPC and her consequential physical and emotional damages were caused by the negligent management of Mrs. Correa's prenatal care and the delivery process. Defendants' departures from the medical standards of care and failure to act in a prudent, reasonable or responsible manner in the medical care provided to Mrs. Correa and her daughter, is in fact what caused the traumatic outcome outlined above.

39. JPC's damages are reasonably estimated at a sum in excess of $10 million, including her pain and suffering, future expenses for her medical care and treatment and the loss of potential to generate future income.

### COUNT I

### (Medical Malpractice, Vicarious Liability – 31 L.P.R.A. §5141; 5142)

40. Paragraphs 1 through 39 of this Complaint are incorporated by reference as if fully set forth herein.

41. HIMA, Dr. Pardo and the John Doe Defendants had a duty to provide medical care to Mrs. Correa and her daughter that complied with the applicable standards of the medical profession. Notwithstanding, HIMA, Dr. Pardo and the John Doe Defendants breached that duty as set forth above.

42. HIMA is further vicariously liable for the negligent acts and/or omissions incurred by the other defendants herein that it employed, contracted with and/or granted privileges to, and by its medical and nursing staff that intervened with Mrs. Correa, for its negligence in the selection, monitoring, supervision and granting of privileges to said nurses and doctors, including Dr. Pardo and the John Doe Defendants.

43. There is a clear and direct causal link between HIMA, Dr. Pardo and the John Doe Defendants' medical malpractice and the damages sustained by plaintiff, as set forth above.

## COUNT II

### (Direct Action Against Insurers – 26 L.P.R.A. § 2003)

44. Paragraphs 1 through 43 of this Complaint are incorporated by reference as if fully set forth herein.

45. Defendants Insurance Companies A through D have a contractual obligation to compensate those who are damaged by the medical errors and omissions of HIMA, Dr. Pardo and/or the John Doe Defendants. As set forth in Count I, above, those defendants committed medical malpractice with respect to Mrs. Correa and her daughter JPC. Moreover, there is a clear and direct causal link between said misconduct and the damage sustained by plaintiff, as set forth above.

46. Under 26 L.P.R.A. § 2003, plaintiff has a right to reclaim directly against the corresponding insurers of HIMA, Dr. Pardo and the John Doe Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests that the Court enter final judgment

against defendants:

1. Finding defendants to be in violation of 31 L.P.R.A. § 5141, 5142 and 26 L.P.R.A. §2003, as alleged hereinabove.

2. Finding defendants jointly and severally liable to plaintiff for the damages sustained by her, plus applicable interest and costs.

3. Awarding plaintiff such other and further relief at law or in equity as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable of right by a jury in the complaint set forth above.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 20th day of October, 2017.

**S/DAVID EFRON**
USDC-PR 125701
**LAW OFFICES DAVID EFRON, PC**
*Attorneys for Plaintiff*
PO Box 29314
San Juan, PR 00929-0314
Tel. 787-753-6455
Fax 787-758-5515
efron@davidefronlaw.com